IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINDA OKEKE, | : | |
|     *Plaintiff* | : | CIVIL ACTION |
| v. | : | |
| | : | |
| LNL HOME SERVICES, LLC, | : | No. 21-4705 |
|     *Defendant* | : | |

## MEMORANDUM

PRATTER, J.                                                                                                  MARCH 5th, 2024

LNL Home Services allegedly did not pay Linda Okeke wages and revenue-based compensation to which she was contractually entitled. Ms. Okeke ultimately resigned from LNL because of the racial discrimination she experienced as an employee and now asserts claims for race discrimination under 42 U.S.C. § 1981 (Count I), unpaid wages under the Pennsylvania Wage Payment and Collection Law (Count II), and breach of contract (Count III).

LNL Home Services filed a motion for summary judgment, arguing that Ms. Okeke was paid the wages to which she was contractually entitled, and that she was not entitled to overtime or revenue-based compensation. Because material issues of fact remain in dispute, including the material terms of the employment contract, the Court denies the motion for summary judgment.

### BACKGROUND

Linda Okeke is an African American woman. She contends that she began her employment with LNL Home Services on September 30, 2020 as a Program Specialist. Under her employment contract, Ms. Okeke avers that LNL Home Services agreed to pay her an annual salary of $40,000 to be paid bi-weekly. The contract also listed a four-year term of employment.

Ms. Okeke contends that LNL Home Services did not pay her the wages she was owed under her contract during her period of employment. Although she began working for LNL Home

1

Services on September 30, 2020, she reports that she did not receive her first paycheck until February 8, 2021. She never received back pay for her time worked between September 30, 2020 and February 7, 2021. Although she was paid her proper salary from February 8 to March 28, she was underpaid for the period between March 29 and her resignation on April 7. She also contends that LNL Home Services failed to pay her for additional time that she worked outside of her regular shifts.

Ms. Okeke further contends that LNL's owner, Larry Allouche, promised to pay her 5% of LNL's revenue. Mr. Allouche has decision-making authority over the LNL's employment decisions. In her deposition, Ms. Okeke explained that on December 1, 2020, she met with Mr. Allouche, and he promised to pay Ms. Okeke 5% of LNL Home Services' revenue moving forward. Ms. Okeke contends that she accepted this offer by continuing to work for LNL Home Services. No written memorialization of this agreement has been produced.

During Ms. Okeke's time as an LNL Home Services employee, Mr. Allouche made racially charged comments to her and other staff members. For example, Mr. Allouche told Ms. Okeke that he wanted more white people working for LNL Home Services. He also called another employee the n-word and encouraged clients to use racist language with LNL employees. As a result of the allegedly toxic work environment created by Mr. Allouche, Ms. Okeke resigned her position at LNL Home Services on April 7, 2021. When Ms. Okeke went to Mr. Allouche's office to get her final paycheck, he refused to give her the paycheck and called Ms. Okeke a "Black bitch" and "big gorilla."

By contrast, LNL Home Services contends that it overpaid Ms. Okeke under the terms of her employment contract. First, LNL maintains that Ms. Okeke's employment began not on September 30, 2020 but on December 18, 2020. LNL emphasizes that, on December 18, Ms.

Okeke signed an offer letter, which set her wages at the minimum wage of $7.25 per hour.[1] Because this letter asserts that Ms. Okeke was only entitled to $7.25 per hour rather than $40,000 annually, LNL Home Services argues that Ms. Okeke was paid substantially more than what was promised in the December 18, 2020 offer letter. In support of this position, LNL Home Services points to an excerpt from Ms. Okeke's deposition testimony during which she putatively stated that she was paid for the hours she spent working but was not paid a higher overtime rate for these hours.[2]

According to Ms. Okeke's ADP pay statements, she was paid $1,538 every two weeks, which corresponds to $769 per week.[3] LNL Home Services asserts that this amount would compensate Ms. Okeke for 106 hours per week at the $7.25 rate of compensation set forth in the December 18 offer letter. Alternatively, LNL Home Services provides that, if "overtime" hours were included in this $769 per week, then Ms. Okeke would be compensated for 40 hours per week at her normal rate and 44 overtime hours, meaning she was being compensated for a total of 84 hours worked in one week. Relying on this characterization of Ms. Okeke's compensation, LNL Home Services argues that Ms. Okeke was overpaid under the terms of her contract.

## Legal Standard

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under

---

[1] Ms. Okeke argues that this offer letter did not set the wages for her employment with LNL Home Services, rather it set the wage for the New Hire Orientation trainings. The letter reads in relevant part "All New Hire Orientation trainings will be paid at a rate of $7.25 per hour and will be included in your first working paycheck." The offer letter has a blank space where the employee's salary is intended to go.
[2] Ms. Okeke is not asserting a claim for overtime pay.
[3] These payments correspond to an annual salary of $40,000 per year paid bi-weekly.

the governing law." *Id.* "On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal quotation marks omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . ." 42 U.S.C. § 1981(a). "Make and enforce contracts" is defined as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). "In order to state a claim under § 1981, a plaintiff 'must allege facts in support of the following elements: (1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts . . . .'" *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 797 (3d Cir. 2001) (alterations in original) (quoting *Yelverton v. Lehman*, No. Civ. A. 94–6114, 1996 WL 296551, at *7 (E.D. Pa. June 3, 1996), *aff'd mem.*, 175 F.3d 1012 (3d Cir. 1999)).

"All claims of race discrimination brought under Title VII [and] § 1981 . . . are governed by the familiar burden-shifting framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)." *Vaughan v. Boeing Co.*, 733 F. App'x 617, 622 (3d Cir.

4

2018) (internal quotation marks omitted); *accord Collins v. Kimberly-Clark Pa., LLC*, 247 F. Supp. 3d 571, 588 (E.D. Pa. 2017) (collecting cases). The plaintiff thus "carr[ies] the initial burden . . . of establishing a *prima facie* case of racial discrimination." *McDonnell Douglas*, 411 U.S. at 802. To establish racial discrimination, the "plaintiff must show that: 1) [she] is a member of a protected class, 2) [she] was qualified for the position [she] sought to attain or retain, 3) [she] suffered an adverse employment action, and 4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Vaughan*, 733 F. App'x at 622 (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013)). If the plaintiff makes a *prima facie* case, "the burden then 'shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* (alteration in original) (quoting *McDonnell Douglas*, 411 U.S. at 802). Lastly, if the employer successfully articulates such a reason, "the burden shifts back to the plaintiff to show that the employer's 'stated reason . . . was in fact pretext.'" *Id.* (alteration in original) (quoting *McDonnell Douglas*, 411 U.S. at 804).

"Adverse employment action" under § 1981 "is linked to Title VII's description of employment actions that may not be based on an employee's race." *Barnees v. Nationwide Mut. Ins. Co.*, 598 F. App'x 86, 89–90 (3d Cir. 2015). "Title VII and section 1981, therefore, do not provide relief for general unpleasantness that can occur in the workplace, even if that unpleasantness may be motivated by racial animus. Rather, those statutes provide relief only if discrimination is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Id.* at 90 (internal quotation marks omitted).

Moreover, a plaintiff must demonstrate that "race was a but-for cause of [her] injury." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). The Third Circuit Court of Appeals has stated that

> [t]o establish the fourth element [of a race discrimination claim], a plaintiff may either: (1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action.

*Greene v. V.I. Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014). An inference of discrimination can be supported through various means and is not limited to the presentation of comparator evidence. *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010). The plaintiff can also introduce "evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial animus." *Id.* Comments by decisionmakers, which demonstrate racial bias, can also give rise to an inference of intentional discrimination. *See Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1215 (3d Cir. 1995) ("[D]iscriminatory comments by an executive connected with the decisionmaking process will often be the plaintiff's strongest circumstantial evidence of discrimination.").

## DISCUSSION

### A. Ms. Okeke's § 1981 Claim

The parties do not dispute the first two elements of Ms. Okeke's *prima facie* § 1981 claim: Ms. Okeke is a member of a protected class, and she was qualified for the position of Program Specialist. Their dispute centers around the third and fourth elements, namely whether Ms. Okeke suffered an adverse employment action, and to the extent she did, whether the action occurred under circumstances giving rise to an inference of intentional discrimination.

#### a. *Adverse Employment Action*

LNL Home Services argues that the only adverse action underlying Ms. Okeke's claim is LNL Home Services' alleged failure to pay Ms. Okeke for all hours worked. Indeed, Count I of Ms. Okeke's complaint—her § 1981 claim—explains: "Plaintiff avers that Defendant

6

discriminated against her with respect to the terms and conditions of her employment on account of race by failing to pay Plaintiff her agreed upon wages." Compl. ¶ 35, Doc. No. 1. According to LNL, because the record demonstrates that LNL either adequately paid or overpaid Ms. Okeke, there can be no § 1981 claim because there is no adverse action. This contention presumes that Ms. Okeke's employment contract is the December 18, 2020 offer letter, which purports to set Ms. Okeke's compensation at $7.25 per hour.

Ms. Okeke argues that there is a genuine issue of material fact as to whether she suffered an adverse employment action. She notes that her paystubs support her deposition testimony that LNL Home Services failed to pay (1) her salary for the first 19 weeks of her employment, from September 30, 2020 through February 7, 2021; (2) her full salary for the time she worked from March 29, 2021 through April 7, 2021; (3) revenue-based compensation; and (4) additional time that she worked outside of her regular shifts.

LNL Home Services has not met its burden of demonstrating the absence of a factual dispute regarding this claim. *See Celotex*, 477 U.S. at 323. There is clearly a dispute as to whether or not Ms. Okeke was paid in accordance with the terms of her employment contract because there is a dispute about what constitutes the employment contract. A reasonable jury could conclude that LNL owed Ms. Okeke a $40,000 salary under her employment contract, *see Anderson*, 477 U.S. at 248, especially in light of the improbability that LNL overpaid Ms. Okeke by paying her exactly the amount she would have been owed under such a contract. A jury could also conclude that Mr. Allouche orally promised to pay Ms. Okeke 5% of LNL's total revenue based on her consistent testimony to that effect. *See* Okeke Dep. Tr., 37:20–22, 98:4–99:13, 100:17–102:3. Finally, that same jury could reasonably conclude that Ms. Okeke was owed overtime pay. *See, e.g.*, Okeke Dep. Tr., 122:1–19 (describing overtime worked on and around the Easter holiday). Because there

7

is a factual dispute as to whether Ms. Okeke was not paid what she was due, it would be inappropriate to grant summary judgment on this basis.

### a. *Inference of Discrimination*

LNL Home Services argues that, even if the Court were to conclude that a jury could reasonably find an adverse employment action, Ms. Okeke's § 1981 claim still fails as a matter of law because she cannot produce evidence giving rise to an inference of intentional discrimination. LNL has failed to carry its burden with respect to this argument.

LNL Home Services argues that most of Mr. Allouche's statements upon which Ms. Okeke relies to demonstrate racial animus are inadmissible because Ms. Okeke does not have first-hand knowledge of these statements, and they arguably constitute inadmissible hearsay. According to LNL, the only statements regarding which Ms. Okeke indisputably has first-hand knowledge are the statements made by Mr. Allouche to Ms. Okeke when she tried to pick up her final paycheck. LNL emphasizes that these statements were uttered about two weeks after Ms. Okeke resigned and asserts that they are therefore irrelevant to whether a reasonable inference of intentional discrimination could be drawn.

For at least two reasons, LNL has failed to demonstrate the absence of an issue of material fact with respect to the inference of intentional discrimination. First, LNL misidentifies the adverse employment action at issue in this case. The Court recognizes that "stray remarks by . . . decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Parker v. Verizon Pa., Inc.*, 309 F. App'x 551, 559 (3d Cir. 2009) (internal quotation marks omitted) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 767 (3d Cir. 1994)). However, Mr. Allouche's statements were not temporally remote from the adverse employment action at issue here, namely the failure to pay Ms. Okeke. By arguing that

8

Mr. Allouche's statements are irrelevant to the inference of intentional discrimination because they post-date Ms. Okeke's *resignation*, LNL ignores the fact that Mr. Allouche called Ms. Okeke a "black bitch" and "big gorilla" *while he was refusing to give Ms. Okeke her final paycheck*. Because the adverse employment action in this case is LNL's failure to pay Ms. Okeke, she has first-hand knowledge of Mr. Allouche's use of racial slurs precisely when the alleged adverse employment action occurred in part. A jury could reasonably infer intentional discrimination based on this evidence alone.

Second, in a bit of a headscratcher, most of LNL's perfunctory hearsay argument appears to be irrelevant to the issue of racial discrimination. After dismissing Mr. Allouche's statements discussed in the previous paragraph, LNL's Motion for Summary Judgment summarily asserts, "[a]s for the remaining statements, [Ms. Okeke] does not have first-hand knowledge of any of them," citing excerpts from Ms. Okeke's deposition transcript without explanation. Mot. for Summ. J. at 11, Doc. No. 27 (citing without explanation Okeke Dep. Tr. 64:4–6, 64:2–66:14; 67:15–68:1; 113:7–18; 113:19–114:21). In most of these unexplained excerpts, Ms. Okeke discusses Mr. Allouche's discriminatory attitude towards Ms. Okeke based on her *weight*, not her race. *See* Okeke Dep. Tr., 64:4–6, Doc. No. 27-5 (discussing statement that Ms. Okeke was "too big"); *id.* at 64:2–66:14 (discussing Mr. Allouche's concern that Ms. Okeke was not "physically healthy enough to chase a client down"); *id.* at 67:15–68:1 (discussing Mr. and Mrs. Allouche's concern that Ms. Okeke was "too big to do this job"). However, this case is about LNL Home Services' discrimination against Ms. Okeke based on her race, not her weight. To the extent LNL has hearsay objections to evidence that Mr. Allouche used the n-word with employees and encouraged clients to use racially charged language with LNL employees, *see id.* 111:9–112:7, LNL can make those objections with specificity and citation to authority at trial. In the meantime,

9

the Court finds that a reasonable jury could infer racial discrimination based solely on the statements Mr. Allouche made to Ms. Okeke when he refused to give Ms. Okeke her final paycheck.

Thus, the Court denies LNL Home Services' motion for summary judgment on Ms. Okeke's § 1981 claim.

### I. Failure to Pay Under the WPCL

Ms. Okeke asserts that LNL Home Services violated the Pennsylvania Wage Payment and Compensation Law ("WPCL"). The WPCL provides that any employee may take action to recover wages payable. 43 Pa. Cons. Stat. § 260.9a. Wages are defined broadly as including "all earnings of an employee" and "fringe benefits or wage supplements . . . ." 43 Pa. Cons. Stat. § 260.2a. Bonuses and equity interest payments owed under a contract or an agreement are also "wages" under the WPCL. *Gautney v. Amerigas Propane, Inc.*, 107 F. Supp. 2d 634, 646 (E.D. Pa. 2000).

The WPCL "does not create a right to compensation . . . . Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. The contract between the parties governs in determining whether specific wages are earned." *Antol v. Esposto*, 100 F.3d 1111, 1117 (3d Cir. 1996) (quoting *Weldon v. Kraft, Inc.*, 896 F.2d 793, 801 (3d Cir. 1990)); *see also Gautney*, 107 F. Supp. 2d at 646 ("Whether specific wages are due is determined by the terms of the contract.") (citing *Does v. Kohn Nast & Graf, P.C.*, 862 F. Supp. 1310, 1325 (E.D. Pa. 1994)). Thus, to successfully present a WPCL claim, the plaintiff must "aver that [s]he was contractually entitled to compensation from wages and that [s]he was not paid." *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 716 (Pa. Super. Ct. 2005).

10

Where no express contract exists, the employee "will have to establish the formation of an implied oral contract" to recover under the WPCL. *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 1996); *see also Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 954 (Pa. Super. Ct. 2011) ("[A]bsent a formal employment contract or collective bargaining agreement, an employee raising a WPCL claim would have to establish, at a minimum, an implied oral contract between the employee and employer."). "Under Pennsylvania law, an implied contract arises when parties agree on the obligation to be incurred, but their intention, instead of being expressed in words, is inferred from the relationship between the parties and their conduct in light of the surrounding circumstances." *Oxner v. Cliveden Nursing & Rehab. Ctr. PA, L.P.*, 132 F. Supp. 3d 645, 649 (E.D. Pa. 2015).

There are numerous disputed issues of material fact that preclude granting summary judgment on Ms. Okeke's WPCL claim. First, there is a dispute of material fact between the parties as to which purported employment contract or agreement governed Ms. Okeke's wages, and thus, governs her WPCL claim. LNL Home Services argues that the governing employment agreement is the December 18, 2020 offer letter, signed by Ms. Okeke, which states that Ms. Okeke's compensation is $7.25 per hour. Ms. Okeke, on the other hand, argues that there was a contract between her and LNL Home Services for $40,000 per year, which is corroborated by those of her paystubs which are consistent with a $40,000 salary. This dispute is "material" because it "might affect the outcome" of Ms. Okeke's WPCL claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Under the WPCL, a specific contract must "govern[] in determining whether specific wages are earned." *Antol*, 100 F.3d at 1117. There is evidence to support the existence of either or both of these contracts. On the one hand, there is the evidence of Ms. Okeke's dated signature on the contract LNL claims to be operative, and, on the other hand, there is evidence in the form of

11

paystubs supporting the contract Ms. Okeke claims to be operative. Additionally, the contracts are not mutually exclusive: Ms. Okeke could both be owed a $40,000 salary and be owed $7.25 per hour for "New Hire Orientation trainings." *See* Offer Letter, Doc. No. 27-3. Thus, there is a disputed issue of material fact as to what contract governs the WPCL dispute.

There is also a disputed issue of material fact as to whether there is an implied oral contract for 5% of LNL Home Services' revenue. LNL asserts that Ms. Okeke has "produced no evidence" to support her allegation that Mr. Allouche promised her 5% of LNL's revenue, but this statement is inaccurate. While the evidence may be thin, LNL ignores Ms. Okeke's deposition testimony about her putative 5% share. *See* Okeke Dep. Tr. 37:20–22; 98:4–99:13; 100:18–101:9. Specifically, Ms. Okeke explained: "I was there helping build a company. I was part of the organization . . . [I]f [Mr. Allouche] wanted me gone, he would have told me to leave. He didn't. I was part of the organization. That's how it works. . . . That's why [he] offered me five percent of the company." *Id.* 37:10–22. Thus, there is evidence that Ms. Okeke continued to work for the newly established LNL because Mr. Allouche promised her 5% of LNL's revenue, and Mr. Allouche continued to employ Ms. Okeke because she was helping to start the new company. *Cf. Oxner*, 132 F. Supp. 3d at 649 (explaining that implied contracts arise "when parties agree on the obligation to be incurred, but their intention, instead of being expressed in words, is inferred from the relationship between the parties and their conduct in light of the surrounding circumstances."). The Court will not determine the credibility of Ms. Okeke's deposition testimony at summary judgment. *See Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (quoting *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993)) ("At the summary judgment stage of proceedings, courts do not 'weigh the evidence or make credibility

determinations,' but, instead, leave that task to the fact-finder . . . ."). Thus, there is a factual dispute regarding Ms. Okeke's putative 5% share in LNL Home Services.

The Court denies LNL's motion for summary judgment on Ms. Okeke's WPCL claim.

## II. Breach of Contract

Finally, LNL requests that the Court grant summary judgment on Ms. Okeke's breach of contract claim. Under Pennsylvania law, "a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)) (alteration in original).

The Court denies LNL's motion for summary judgment on Ms. Okeke's breach of contract claim for the same reasons that it denies LNL's motion for summary judgment on her WPCL claim. The parties agree that a contract exists. However, the Court cannot resolve Ms. Okeke's breach of contract claim because there are genuine disputes of material fact as to what duties Ms. Okeke's contract imposed upon LNL and whether or not LNL Home Services breached those contractual duties by failing to pay Ms. Okeke. If the December 18, 2020 offer letter setting compensation at $7.25 is the operative contract, then LNL Home Services argues that it could not have breached a contractual duty because it fully complied with the terms of this letter. If the agreements for a $40,000 salary plus 5% revenue-based compensation constitute the operative contract, then it appears that LNL has not fulfilled its contractual obligations.

The Court denies LNL Home Services' motion for summary judgment on Ms. Okeke's breach of contract claim.

CONCLUSION

Genuine issues of material fact preclude summary judgment on Ms. Okeke's § 1981, WPCL, and breach of contract claims. Thus, the Court denies LNL Home Services' motion for summary judgment. An appropriate order follows.

BY THE COURT:

/s/ Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE